Good morning. May it please the Court, my name is Philip Hornick. I'm the attorney for the petitioners Al-Mazdabebi and her husband, Sissi Mkhouspiou. They are two men who were in a caravan with their children. And I've reserved two minutes for rebuttal. All right, counsel, please keep track of your time. Thank you. My clients came to the United States under an exchange program sponsored by the former and now widely despised military dictatorship which then ruled Ethiopia. Mr. Mengistu is the child of parents who worked for the deposed government and because of their allegiance to that government were jailed by the current regime and had their civil liberties restricted. These are the parents? That's the parents of Petitioner Mengistu. While in the United States, Mr. Mengistu joined an organization known as Nadine which is based in Ethiopia and still exists and which calls for the overthrow of the current regime. At what point in time did the petitioner join? 1993. And we ask that you review the immigration judge's conclusion that petitioners don't have a well-founded fear of persecution or face a clear probability of persecution if they're returned to Ethiopia. Because the Board of Immigration Appeals adopted and affirmed the immigration judge's decision without making an independent analysis of petitioner's case, it is the immigration judge's decision that this Court must review. The immigration judge's decision is reviewed, should be reviewed as if the Board authored it in the first instance and that has been so held and yet has tied up the INS which is a case that has been mentioned by Respondent. Mr. Mengistu's imputed political opinion as well as his activity with Nadine should be of concern to you. This Court has recognized in Maldonado Cruz v. INS, a case that was not mentioned in my brief, that a political opinion even erroneously imputed to an asylum applicant may give rise to a valid asylum claim. Counsel, could we examine the extent of the petitioner's involvement? What was the level of his involvement in the organization? Most significantly, he attended a conference in Washington, D.C. of that organization, not far from the embassy of the Ethiopian government, that is to say of the current regime. Is he an officer of the organization? Not to my knowledge, no. And he joined in 1993 and attended one conference in 1996. That's pretty much the extent of the involvement? I believe that he was in activities here in Oregon, but we felt that most central to this case was attending in the nation's capital a meeting with a number of other members that it would seem likely the current government would want to be aware of who was at that meeting. Is there any indication that the government requested a list or received a list of the attendees? I don't believe so, but there are many ways that governments can monitor the activities of other people. There would hardly have been a subtle way to do that. But no, I don't believe there's any evidence that a list was given. Is there any significance to the fact that the petitioner joined the organization after he applied for asylum? We feel that there isn't. I recall the immigration judge implied his concern about that as part of his decision, but whatever the reason is, should Mr. Mengistu be forced to return to Ethiopia, it just does not seem reasonable that the government is not only going to inquire of his activities, but look at the timing of his joining and measure his motive for joining. It's still, whenever he did join, if he had activities with that organization and if members of that organization have been harmed in Ethiopia or fear persecution, then he still should have a well-founded fear. What is that evidence of persecution? I may just refer to an item that was in the record from a representative of the U.S. Embassy in Addis Ababa. This was at page 211 of the record. It is possible that some members might be in risk for arrest or detention upon their return to Ethiopia. Is that possible? Is that enough to meet your burden? We believe that it would be. The standard is well-founded fear of persecution. In Cardozo Fonseca, the Supreme Court's decision in that case, there was a comment that there's simply no room in the United Nations definition of refugee for concluding that because an applicant has only a 10% chance of being shot, tortured, or otherwise persecuted, that he has no well-founded fear of the event happening. Counsel, that letter that you addressed, didn't it preface its remarks by saying those members who advocate violence may have some fear of persecution upon their return? It does say that, but it doesn't, in my view, state that that's an outer limit of the members who face harm. It says some members advocate violence. It says some, and I believe, let me turn again to it so that we're even before the court. Some members do advocate violence. It is possible that some members might be at risk for arrest. It says because some MEHIM members do advocate violence, it is possible that some members might be at risk for arrest or detention. Correct, and we believe that part of Mr. Magistri's claim is an imputed as well as an actual opinion, so that regardless of, and he has stated that he does not advocate violence, that an opinion could well be imputed to him by the government that he does, and his statements that he doesn't might be viewed with either suspicion or in the abundance of caution. The government might not want to wait to see whether his statements are sincere or not. Therefore, we believe that the immigration judge's factual conclusions in this case are not based on substantial evidence, and we believe it's far from certain that a renunciation of violence or advocacy of that would protect Mr. Magistri. And I say this especially if you look at the totality of his circumstances and that of his family, including his parents' membership in the Ethiopian Workers' Party and the sponsoring of his education by the regime that was later overthrown by the current regime. What about the country conditions report? What effect does that have on your argument? Do you mean the report issued in 97 prior to this hearing? Yes. We don't feel it's determinative. It does make some comment about that civil liberties are not absolutely restricted in all instances, but it even does mention the group Medina, I believe, as a group that is hardly in favor with the government there, and that there are instances where the government deals with its opponents in a harsh means that certainly would not be acceptable in this country. What about the country conditions report that was referenced in the decision of the ALJ? I believe that's the one that I was speaking to, Your Honor. Oh, all right. Okay. Because I thought it generally said that for those who renounce violence, there are generally no repercussions. Well, I don't dispute that reference, but again, I guess that's generally, and again, we can't be sure that that would be the case. Is that the standard? What's the standard of proof? Well-founded fear of persecution. The judge's findings must be based on substantial evidence. Listen, Derek, I mean, don't you have to convince us that a reasonable fact finder would have been compelled to find that? That is correct, but again, with the totality of the facts of this case, the fact that there isn't a place within the country that petitioners can go to, the family of Miss Abebe suffered for different reasons, and that there isn't a safe harbor for them, we believe shows that we haven't met that standard. Counsel, what's the status of the alien labor certification application that's been submitted? It's pending. All right. You wanted to save some time for rebuttal? Yes, I would. All right. Thank you. Thank you, Counsel. May it please the Court, my name is Juliet Winston, and I represent the respondent, the Immigration and Naturalization Service, in this case. This case is here on a petition for review. The Board of Immigration Appeals stated that the immigration judge's decision was thorough and well-reasoned, adopted, and affirmed the immigration judge's decision. The Board denied asylum and the holding of deportation. The only issue presented for asylum was a well-founded fear of future persecution. The issue that remains in this case is whether substantial evidence supports the finding that petitioner does not have a well-founded fear of future persecution. Counsel, there's a young lady in this courtroom. You probably noticed her when you came in behind you. This case involves her. Can you assure this court, under your circumstances, would that little girl be subject to female genital manipulation? I believe that no assurance can ever be given on that type of question. That 1994 report is so out of date that it's pitiful. Even that report indicated the fact that most women, most women in Ethiopia have undergone female genital manipulation. Now, can you assure me, at least me, that that young girl back there would not be subject to that? In this case, the control over that question depends on the family. Mrs. Abibi testified at her hearing on that very point, and she stated, and I quote, I think I, I think I will be, I will be rejected by my family, my husband's family, and my society, too. But she indicated that she and her husband could prevent that from happening as the parents of that little girl. There's no guarantee at all that subject to pressures by the family, subject to pressures by the government, they may have to accede to that horrible, sickening act. It is horrible, and it is sickening. And they could be, they could be, they could be forced to give their consent. It is still within their control. And under the record in this case, which the court- It's not under their control if they can, if they can be forced to give it. And there's no guarantee in any place, and you cannot guarantee it, that they would not be forced. Even her relatives are in favor of it. That's correct. I cannot guarantee it. All right. But I can say that the testimony in this case was that the family testified, and in particular, Mrs. Abebe testified that she could control that, that she had a choice. It's up to her to make that choice. It's up to the family to make that choice with regard to their own children. This is not a government-required act. This is a family, societal act. And it seems to be more in vogue in the rural areas than it is in the urban areas. You want to send this family, which is the basis of American culture and civilization, a good family life, back to a country where they were absolutely marvelous citizens in America, people in America, back to a country that her daughter may be possibly subject to a horrible act. Under the facts and the record- Isn't that somewhat cruel? Well, on an individual basis, sometimes it is, but there's still immigration laws, and those laws- Just like those English judges, right? They just get used to things. Well, there are immigration laws, and it's not to say that female genital mutilation is never a grounds for persecution.  But in this case, the family has testified that they have the control over that matter, and it's not something that's enforced by the government or required by the government. It's a societal event, and the family can control it. They may take a risk of being shunned or excluded from their own families, but that's a risk they can decide to take as parents. In this case, the issue here is whether the Board of Immigration Appeals has used this discretion, whether the petitioners met their burden of proof. Was there substantial evidence to support the finding that the petitioners do not have a well-founded fear of persecution or a fear of the probability of being put on a political ground? The answer to that question is yes. Only when a contrary conclusion can be compelled would the court look into the facts of the matter and weigh the facts. But at this time, there's been no abuse of discretion here, and no contrary conclusion can be reached. Petitioners had a full and fair opportunity to present their case. They were represented by counsel. Mr. Mengistu filed an application for asylum. There was a full merits hearing, a declaration submitted, plenty of documents, reports, and letters, a 500-page administrative record. There was a full and fair opportunity for these individuals to be heard. There are several areas that Mr. Mengistu had pointed to to show a fear of future persecution. One was that his father and stepmother were detained for two weeks because they belonged to a party called the Workers' Party of Ethiopia. Mr. Mengistu never belonged to that party. And the immigration judge concluded that even if he is subject to the same treatment, that would not rise to the level of persecution. A second worry is that his scholarship, when he was sent to this country, came from the former Mengistu government that was overthrown in 1991. The country reports indicate that there's no abuse toward people that were connected to the former communist regime. The other fear that he states he has is his connection with the Menging Party. As Your Honor has suggested, his level of involvement was very minimal. He was not an officer in the Menging Group. He attended one conference where there were 100 people in Washington, D.C., and there's no evidence that he has any indication that he attended. Most importantly, the country reports state that violence is required in order for prosecution to actually occur in Ethiopia, that people who are connected to the Menging Party are not persecuted, they're not even prosecuted unless they espouse violence, unless they are trying to overthrow the government of Ethiopia. As the profile says, regarding the Menging Party, its members would therefore appear to be at risk of prosecution unless, as is the case with other political leaders, the individual personally renounced violence as a means of political change. That's in the administrative record, page 276. In this case, Mr. Mengistu did personally renounce violence. He stated on page 117, Well, I don't believe in violence. I believe in democratic process and try to work to a peace of means. Later, when he was asked a question about whether he'd be willing to renounce violence, he responded, I would be willing to renounce violence. The last issue is the issue of FGM, female genital mutilation. First, that argument has been laid, which is neither addressed in the notice of appeal nor in the brief of the Board of Immigration Appeal. In any event, that's an issue that should be within the family's control, and I would understand that certainly they would want to protect their child when they return to Ethiopia. In conclusion, this case should be affirmed, the Board's decision in this case should be affirmed, because it is based on substantial evidence. There's no contrary conclusion can be held with regard to asylum or withholding a visa. Thank you. Thank you, counsel. Rebuttal? Thank you. I had some comments I wanted to make. I am somewhat concerned that the Respondents' Council has stated, I believe that Ms. Abebe had said that she could, in testimony, prevent female genital mutilation. I do see that in case 6 of the record, the judge stated that she testified she would be able to prevent it, but I must say that in my review of the record, I don't see that exactly such testimony occurred. In the direct exam of her on that point, there was some testimony, and at page 164, the question is asked, what do you think is going to happen to you if you go back and you're not willing to let this happen to your daughter? The answer is, I think I will be rejected by my family, my husband's family, and my society, too. I don't think that that statement necessarily stands for the thought that she can control that, and, again, it's not entirely within her hands to control that. So I did want that to point to those questions. Thank you, counsel. The case that's argued is submitted. We'll be in recess for five minutes. All rise. We're going to recess for five minutes. We're going to recess for five minutes.
judges: Alarcon, Ferguson, Rawlinson